**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

ECHELON INTERNATIONAL LLC

Plaintiff,

v. Case No.:

WARRIOR WON CONTRACTING LLC;
SCOTT LEE SNIDER,

Defendants.
______________________________/

**COMPLAINT**

Plaintiff, Echelon International LLC ("Echelon"), by and through its undersigned counsel, files this Complaint against Defendants, Scott Lee Snider ("Snider") and Warrior Won Contracting LLC ("Warrior Won") (collectively, "Defendants"), and states:

**PARTIES**

1. Echelon is a Florida limited liability company with its principal place of business at 4508 Oak Fair Blvd., Suite 230, Tampa, Florida 33610. Echelon's members are all residents of the State of Florida.

2. Warrior Won is a Washington limited liability company with its principal address at 100 N Howard St STE R, Spokane, WA, 99201, United States. Warrior Won's only member is Snider.

3. Snider is a United States citizen who presently resides in Japan at 3-9-23 Jomyoji, Kamakura, Kanagawa 248-0003, Japan.

## JURISDICTION AND VENUE

4. This is a civil action for breach of fiduciary duty against Snider; violation of the Florida Uniform Trade Secrets Act, Florida Statute § 688.001 et seq., and unjust enrichment.

5. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

7. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Echelon's claims occurred in this District and the harm to Echelon occurred in this District.

## FACTUAL BACKGROUND

### A. Echelon's Business Background.

8. Echelon is a veteran-owned and veteran-operated procurement and integrated solutions partner serving the United States Department of Defense, other United States Government agencies, and allied partners.

9. Echelon's owners and employees consist primarily of ex-U.S. military veterans, including ex-special forces operators.

10. Echelon specializes in procuring, integrating, and deploying equipment and systems for its clients. Its business includes sourcing equipment, coordinating logistics, integrating components and systems, and delivering operational solutions tailored to client needs worldwide. Through these services, Echelon manages complex supply chain and operational demands to ensure the timely and efficient delivery of mission-critical equipment to its clients.

11. Echelon relies on its employees to cultivate opportunities directly from clients and to bid on contracts issued through formal procurement processes.

12. The Department of Defense, United States Government agencies, and allied partners commonly issue contracts through formal procurement processes. These contracts are issued to secure the delivery of specific military equipment and supplies to bases and agency locations around the world. Echelon commonly bids on these contracts, leveraging its vast connections and logistical expertise to source and deliver products that meet contract specifications.

13. Echelon provides employees in business generating roles with access to its confidential, proprietary, and trade secret information. Echelon's trade secrets include compilations of customer lists and procurement information, including information relating to pricing strategy, buying preferences, procurement patterns, and Echelon's internal strategies for positioning proposals. In addition, this information includes Echelon's unique logistical processes and methods that allow it to perform on procurement opportunities and outperform its competitors.

14. This information gives Echelon a competitive advantage in pursuing opportunities by allowing Echelon to price, structure, and position bids based on nonpublic knowledge of client needs and expectations. It also provides Echelon a competitive advantage by putting it in a unique position to satisfy procurement contracts in a more logistically and cost-efficient manner than its competitors.

15. Echelon takes reasonable measures to maintain the secrecy of its trade secrets, including limiting access to employees with a business need to know, maintaining confidentiality policies in its Employee Handbook, requiring employees to protect confidential and customer information, and requiring employees to disclose conflicts of interest and outside business activities.

**B. <u>Echelon Hires Snider.</u>**

16. On or about November 11, 2025, Echelon extended a written Employment Offer Letter to Snider for the position of Regional Sales Manager. Snider accepted the terms of the Offer Letter.

17. Snider's employment with Echelon commenced effective January 1, 2026.

18. At the time Echelon employed Snider, he resided in the state of Washington, traveling to Japan on a regular basis for business.

19. Echelon entrusted Snider with exclusive responsibility for business development throughout the United States Indo-Pacific Command ("INDOPACOM") region, including developing new customer relationships,

identifying and pursuing sales opportunities, and bidding on contracts for Echelon in the region.

20. As part of his employment responsibility, Snider was expected to locate and secure new contracts and business opportunities for Echelon.

21. Snider reported directly to Echelon's C-Suite executives.

22. Snider's pay was structured on a partial commission basis, whereby he would receive a percentage of profits on all business he generated for Echelon.

23. Echelon trusted and expected that all employees in business generating roles, including Snider, would present all potential business opportunities to Echelon. This inherent duty was communicated to all employees.

24. Echelon maintains an Employee Handbook that expressly governs, among other things, outside employment and conflicts of interest.

25. Section 2.13 of Echelon's Employee Handbook ("Outside Employment and Conflicts of Interest") and Section 7.10 ("Conflicts of Interest") unambiguously require employees to disclose all financial interests, outside employment, and personal relationships that may impact business decisions. These provisions exist to safeguard against precisely the kind of concealed self-dealing that Snider carried out.

26. Section 7.8 of the Employee Handbook obligates employees to protect confidential information.

27. Snider received and read the Employee Handbook.

28. The Employee Handbook and Snider's employment agreement acknowledged that during employment, Snider would have access to confidential, proprietary, and trade secret information of the company and its affiliates, and its customers, clients, and vendors, including non-public information about transactions and proposed transactions, processes, data, know-how, and information regarding the company's products and services, marketing and business plans, contracts, suppliers, and business connections.

29. Snider acquired knowledge of Echelon's trade secrets and confidential information through his employment as Regional Sales Manager and under circumstances giving rise to a duty to maintain their secrecy and limit their use to Echelon's business.

**C. <u>Snider Operated a Competitor While Employed by Echelon.</u>**

30. Snider initially established Warrior Won on July 1, 2020. Warrior Won dissolved on March 1, 2022 and was reformed on April 30, 2025. Snider is its CEO, sole point of contact, sole member, and only employee.

31. Warrior Won's physical address was initially Snider's personal apartment in Washington.

32. Warrior Won is a direct competitor of Echelon. Both companies are registered in the necessary databases to pursue the same procurement opportunities. Indeed, Warrior Won's registration with the US Systems for Award Management database ("SAMS") lists NAICS codes that directly overlap with the services Echelon provides, including NAICS 541614 (Process, Physical Distribution

and Logistics Consulting Services), NAICS 488390 (Other Support Activities for Water Transportation), NAICS 561210 (Facilities Support Services), and PSC code R706 (Support-Management: Logistics Support), among others.

33. Initially, Snider was unable to generate significant business for Warrior Won and earned virtually no government contract opportunities for Warrior Won. Put simply, Snider lacked the connections, expertise, and knowledge on his own to compile a successful bid on behalf of Warrior Won and ultimately perform on a procurement contract.

34. Snider's inability to generate meaningful business for Warrior Won led him to dissolve Warrior Won and to seek out other employment opportunities, ultimately leading to his employment with Echelon.

35. After Snider began his employment with Echelon, he gained access to Echelon's confidential information, proprietary processes, and connections that Echelon uses to secure contracts and service clients.

36. Snider saw an opportunity to use Echelon's confidential information, processes, and connections, to siphon opportunities away from Echelon for his personal benefit.

37. During his employment with Echelon, Snider reformed, maintained, and operated Warrior Won, updating its SAM registration as recently as June 13, 2026.

38. At no time during his employment with Echelon did Snider disclose the existence or operation of Warrior Won to Echelon.

39. At no time did Snider request or receive written approval from Echelon to operate an outside business.

40. At all times, Echelon thought Snider worked exclusively for Echelon and had no knowledge of Warrior Won.

**D. <u>Snider Diverted Opportunities from Echelon to Warrior Won.</u>**

41. Exploiting his position of trust and the connections that Echelon provided to him, Snider used Warrior Won to siphon opportunities away from Echelon, while simultaneously drawing a sizeable salary from Echelon. Snider used Warrior Won to bid on the exact same type of procurement opportunities that he was employed and duty-bound to develop on Echelon's behalf.

42. Rather than presenting these opportunities to Echelon as his employment required, Snider secretly routed each procurement through Warrior Won for his personal enrichment and to the direct detriment of Echelon. Snider used the connections and resources of Echelon to both secure these opportunities for Warrior Won and to perform on the contracts.

43. Echelon has identified at least three procurements totaling approximately $10,725,000, in which Snider diverted the opportunity away from Echelon and funneled it through Warrior Won or himself.

44. On information and belief, all of these diversions occurred between February 2026 and May 2026. Each opportunity arose while Snider was employed by Echelon as its Regional Sales Manager and fell squarely within the scope of the duties for which Echelon was compensating him.

45. As a prime example, on or about early May 2026, Echelon paid for Snider to attend the LANPAC Symposium & Exposition, an annual international defense forum hosted in Hawaii by the Association of the United States Army.

46. Echelon sent Snider to LANPAC for the purpose of meeting with Echelon's industry contacts and working with Echelon's partners on developing new opportunities for Echelon. Instead of working on Echelon's behalf at the event, Snider used his Echelon credentials and Echelon's resources to develop opportunities for Warrior Won.

47. At LANPAC, Snider learned about a high-value opportunity worth approximately $10 million relating to the procurement and delivery of naval ship parts to the US Navy.

48. Echelon was fully capable of and positioned to perform on this opportunity. Developing this opportunity for Echelon fell squarely within the scope of Snider's duties as Echelon's Regional Sales Manager.

49. Using the knowledge and connections he obtained through his employment with Echelon, Snider began scheming a way to secure this contract for Warrior Won.

50. Because Warrior Won lacked the financial backing and logistical infrastructure to perform on this high value opportunity alone, Warrior Won needed a secondary partner in order to win a bid and deliver on the opportunity.

51. At the LANPAC exposition, Snider discussed the opportunity with his counterpart at a company called SupplyCore.

52. SupplyCore has been a long-term partner of Echelon and works frequently with Echelon to provide procurement services worldwide. Echelon introduced Snider to his counterpart at SupplyCore, and encouraged Snider to network with him at LANPAC to develop opportunities for Echelon.

53. Rather than presenting this marquee $10 million opportunity to Echelon, as he was hired to do, Snider brazenly bid on the contract with Warrior Won as the supplier – not Echelon – and used SupplyCore as Warrior Won's procurement partner.

54. Warrior Won eventually won the bid and received the opportunity.

55. Snider's intimate knowledge of Echelon's pricing strategy and bid strategy allowed him to fashion competitive bids through Warrior Won that he could not otherwise have assembled.

56. Additionally, Snider leveraged Echelon's industry connections to secure logistical services and financial backing necessary to perform on these contracts. Snider and Warrior Won would have been unable to perform absent the connections and information Snider gained from his employment with Echelon.

57. By pursuing and securing procurements through Warrior Won, Snider placed himself and Warrior Won in direct competition with his employer for the same government contracting opportunities he was hired to win for Echelon.

58. All of the wrongful conduct described herein—including Snider's secret operation of a competing enterprise, his brazen capture of business

opportunities, and his systematic diversion of at least three procurements totaling approximately $10,725,000—occurred while Snider was an employee of Echelon, and owed fiduciary and contractual duties of loyalty, disclosure, and good faith to Echelon. Snider betrayed every one of those obligations.

**COUNT I: BREACH OF FIDUCIARY DUTY**
**(Against Snider)**

59. Echelon realleges and incorporates by reference paragraphs 1 through 58.

60. At all relevant times, Snider was an employee of Echelon.

61. At all relevant times, Snider owed Echelon a fiduciary duty of loyalty, good faith, and honesty as its Regional Sales Manager, a position of substantial trust and confidence.

62. Snider's fiduciary duty to Echelon required him to act in Echelon's best interests, to avoid conflicts of interest, to disclose material information affecting Echelon's business, and to refrain from competing with Echelon or usurping corporate opportunities that belonged to Echelon.

63. Snider breached his fiduciary duty to Echelon by using confidential information acquired during the course of his employment and soliciting customers on behalf of a competing entity. Among other things, Snider:

i. Secretly operated Warrior Won, a direct competitor, while employed by Echelon;

ii. Failed to disclose the existence and operation of Warrior Won to Echelon;

iii. Diverted business opportunities that belonged to Echelon to Warrior Won or himself for his personal benefit;

iv. Used his position, access to Echelon's confidential information, and customer relationships to compete against Echelon; and

v. Placed his own financial interests above those of Echelon.

64. As a direct and proximate result of Snider's breach of fiduciary duty, Echelon has suffered substantial damages, including but not limited to lost revenue from the diverted procurements totaling approximately $10,725,000, damage to customer relationships, and harm to its business reputation and goodwill.

65. Snider's conduct was willful, deliberate, malicious, and in reckless disregard of Echelon's rights, justifying an award of punitive damages.

**COUNT II: Florida Uniform Trade Secrets Act Violations**
**(Against All Defendants)**

66. Echelon realleges and incorporates by reference paragraphs 1 through 58.

67. Echelon owns and possesses trade secrets within the meaning of FUTSA. Fla. Stat. § 688.002.

68. These trade secrets derive independent economic value from not being generally known and not being readily ascertainable by proper means

because a competitor with access to them can avoid the time, expense, and uncertainty of developing its own customer relationship, pricing strategy, supplier network, and bid intelligence.

69. These trade secrets gave Echelon a competitive advantage in pursuing opportunities by allowing Echelon to price, structure, and position bids based on nonpublic knowledge.

70. Echelon took reasonable measures to maintain the secrecy of its trade secrets, including limiting access to employees with a business need to know, maintaining confidentiality policies, requiring employees to protect confidential and customer information, and requiring employees to disclose conflicts of interest and outside business activities.

71. Snider acquired knowledge of Echelon's trade secrets through his employment as Echelon's Regional Sales Manager and under circumstances giving rise to a duty to maintain their secrecy and limit their use to Echelon's business.

72. Snider was not authorized to use Echelon's trade secrets to operate, support, price, promote, or obtain business for Warrior Won.

73. Snider provided these trade secrets to Warrior Won.

74. Snider and Warrior Won misappropriated Echelon's trade secrets by using Echelon's proprietary information and connections to secure opportunities for Warrior Won.

75. Snider's misappropriation is further shown by the timing and circumstances of the diverted opportunities: while employed by Echelon and

responsible for developing Echelon's business, Snider secretly operated Warrior Won, pursued the same category of opportunities Echelon pursued, and diverted at least three procurements totaling approximately $10,725,000 to Warrior Won.

76. On information and belief, Snider used Echelon's trade secrets to manipulate or calibrate Warrior Won's bid pricing and proposal positioning.

77. Warrior Won misappropriated Echelon's trade secrets by receiving, using, and benefiting from Echelon's trade secrets through Snider, who is Warrior Won's CEO and sole point of contact.

78. Warrior Won knew or had reason to know that trade secrets and confidential information used for Warrior Won's benefit was acquired by Snider through his employment with Echelon and under a duty to maintain its secrecy and limit its use.

79. Defendants' acquisition, disclosure, and use of Echelon's trade secrets was without Echelon's consent and constitutes misappropriation under FUTSA. Fla. Stat. § 688.002.

80. Defendants' misappropriation has caused Echelon actual loss, including lost business, lost profits, loss of competitive advantage, harm to customer relationships, and other damages to be proven at trial.

81. Defendants have also been unjustly enriched by their misappropriation of Echelon's trade secrets in an amount to be proven at trial.

82. Echelon is entitled to injunctive relief prohibiting Defendants from using or disclosing Echelon's trade secrets and requiring affirmative acts necessary to protect those trade secrets.

83. Defendants' misappropriation was willful and malicious because Snider intentionally concealed Warrior Won, knowingly used Echelon's confidential information for Warrior Won's benefit, and diverted Echelon's customer opportunities for personal gain.

84. Because Defendants' misappropriation was willful and malicious, Echelon is entitled to exemplary damages and reasonable attorneys' fees under Fla. Stat. § 688.004 and Fla. Stat. § 688.005.

**COUNT III: UNJUST ENRICHMENT**
**(Against All Defendants)**

85. Echelon realleges and incorporates by reference paragraphs 1 through 58.

86. This Count is pled in the alternative.

87. Echelon conferred benefits upon Snider, including employment, compensation, access to business opportunities, customer relationships, training, and confidential business information.

88. Snider had knowledge and appreciation of the benefits conferred upon him by Echelon.

89. Snider accepted and retained those benefits under circumstances that make it inequitable for him to retain them without paying their value to Echelon.

90. Snider used the benefits, access, and opportunities provided by Echelon to enrich himself and Warrior Won at Echelon's direct expense by diverting business opportunities worth approximately $10,725,000 from Echelon to Warrior Won.

91. Warrior Won received benefits from Snider's employment relationship with Echelon, including access to procurement opportunities, customer relationships, and confidential business information and trade secrets that Snider wrongfully diverted from Echelon.

92. Warrior Won had knowledge and appreciation of the benefits it received through Snider's wrongful conduct.

93. Warrior Won accepted and retained those benefits under circumstances that make it inequitable for Warrior Won to retain them without paying their value to Echelon.

94. Defendants have been unjustly enriched at Echelon's expense by receiving and retaining the benefits of diverted business opportunities, profits, and competitive advantages that rightfully belonged to Echelon.

95. It would be inequitable and unjust to permit Defendants to retain these benefits without compensating Echelon for the value conferred.

96. Echelon is entitled to restitution and disgorgement of all benefits, profits, and gains that Defendants obtained through their wrongful conduct.

**COUNT IV: FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(Against All Defendants)**

97. Echelon realleges and incorporates paragraphs 1 through 58 as if fully set forth herein.

98. Defendants engaged in "trade or commerce" as that term is defined under Florida Statute § 501.203(8).

99. Defendants engaged in unfair methods of competition and unconscionable, deceptive, and unfair acts or practices by usurping and diverting corporate opportunities away from Echelon (while Snider was employed by Echelon), by using Echelon's confidential business information and trade secrets to unfairly compete with Echelon, and by using Snider's position at Echelon to prevent Echelon from bidding on or obtaining opportunities so that Warrior Won could obtain said opportunities.

100. Defendants have unfairly profited from the aforementioned actions.

101. Echelon has suffered actual damages as a result of the aforementioned actions of Defendants.

102. Echelon is entitled to, among other relief, injunctive relief, and an award of damages pursuant to Florida Statute § 501.211, reasonable attorneys' fees and costs of the action under Florida Statute § 501.2105.

**WHEREFORE**, Plaintiff Echelon International LLC respectfully requests that this Court enter judgment in its favor and against Defendants, and award Echelon the following relief:

a) Actual, compensatory and special damages in an amount to be determined at trial, including but not limited to lost revenue from diverted procurements totaling approximately $10,725,000, damage to customer relationships, harm to business reputation and goodwill, and all other damages sustained as a result of Defendants' wrongful conduct;

b) Punitive damages against both Defendants in an amount sufficient to punish and deter such conduct;

c) Restitution and disgorgement of all profits, benefits, and unjust enrichment obtained by Defendants through their wrongful conduct;

d) With respect to Count II, exemplary damages in an amount not exceeding twice the award of actual damages pursuant to Fla. Stat. § 688.004;

e) Preliminary and permanent injunctive relief enjoining Defendants from:

   i. Using, disclosing, or misappropriating Echelon's trade secrets and confidential information;
   ii. Competing with Echelon using information, opportunities, or relationships obtained through Snider's employment with Echelon;
   iii. Contacting or soliciting Echelon's customers for purposes that compete with or harm Echelon's business;
   iv. Interfering with Echelon's existing or prospective business relationships;

f) Pre-judgment and/or post-judgment interest as provided by law;

g) Declaratory relief finding that Defendants' acts and practices violate FDUTPA

h) Costs of suit;

i) Attorneys' fees; and

j) Such other and further relief as the Court deems just and proper.

*/s/ Paul Punzone*
Paul Punzone, Esq.
Bar No.: 1003511
paul.punzone@hklaw.com
Brigid Buckley, Esq.
Bar No.: 1064469
brigid.buckley@hklaw.com
Holland & Knight LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602
Phone: 1.813.227.6527
Fax: 1.813.229.0134

*Attorneys for Plaintiff*